## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| **DASHAWNA HOLLINGER, BLANCHE** ) | |
| **PAYLOR, and ARLENE ROSARIO** ) | |
| **on behalf of themselves and others** ) | |
| **similarly situated,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **CASE NO. 6:11-cv-59-Orl-19TBS** |
| ) | |
| **HARTFORD FIRE INSURANCE** ) | |
| **GROUP, a foreign for profit corporation,** ) | |
| ) | |
| **Defendant.** ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendant, HARTFORD FIRE INSURANCE COMPANY ("The Hartford"), through its undersigned counsel, and pursuant to Fed. R. Civ. P. 56 and Local Rule 3.01, M.D. Fla., moves for summary judgment against Plaintiffs, DASHAWNA HOLLINGER ("Hollinger"), BLANCHE PAYLOR ("Paylor") and ARLENE ROSARIO ("Rosario") (referred to collectively as "Plaintiffs"). In support, Defendant states as follows:

1.      Plaintiffs bring a three-count Complaint against The Hartford. (Dkt. 31).

2.      In the first count, Plaintiffs allege they were misclassified as exempt employees under the Fair Labor Standards Act ("FLSA") and that they are entitled to unpaid overtime compensation. In the second count, Plaintiffs contend The Hartford interfered with their right to leave pursuant to the Family and Medical Leave Act ("FMLA"). In the third count, Plaintiffs assert The Hartford retaliated against them for taking and/or requesting FMLA leave.

3.      As set forth in more detail hereinafter, Plaintiffs fail to present any genuine issue of material fact, and well-settled law mandates summary judgment in favor of The Hartford.

## PRELIMINARY STATEMENT

Plaintiffs' contention they were misclassified under the FLSA is completely without merit, and contravenes clearly established regulations and case law.  Plaintiffs held the position of Long Term Disability Analyst III ("LTD Analysts III"). (Dkt. 31). This is a very complex position that required Plaintiffs to manage long term disability claims and determine whether a claimant was eligible for long term disability benefits.  This is precisely the type of position that has been held to be exempt under the FLSA.

Plaintiffs' assertion that The Hartford violated the FMLA is likewise unfounded. Plaintiffs were repeatedly granted FMLA leave during their employment and were never denied leave.   In total, Plaintiffs took 1,180.5 hours of FMLA leave in 2008 and 2009. Rosario and Paylor were terminated for violating company rules. Paylor was disciplined for poor performance and voluntarily resigned her employment, delivering a release of all claims to The Hartford. Moreover, in deposition, Plaintiffs all admitted that they engaged in the wrongful conduct which led to their discipline and/or termination.  Plaintiffs simply fail to take responsibility for their own actions and instead seek to blame The Hartford for properly disciplining and terminating poor employees.

<u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

I.   <u>LTD ABILITY ANALYST III POSITION</u>

LTD Analysts III manage long term disability claims and conduct a thorough analysis of whether a claimant is eligible for long term disability benefits.  (G 16:14-20)[1] This is a complex position. (G 18:6-8). LTD Analysts III are responsible for the overall handling of a claim. (G 18:20-23). They are to make accurate and timely claim decisions and appropriate disability benefit calculations. (G 51:4-8). They ascertain the amount of disability benefits to be paid to the claimant based upon the long term disability policy.  (G 50:1-15).  They also assess other income benefits such as social security or work continuation and calculate those amounts as deductions from the benefit amount. (G 17:4-9). They must pay claims correctly and timely. (G 18:10-12). They must comply with turnaround time standards, adhere to ERISA requirements and send timely correspondence to claimants. (G 18:13-19).

In making claim determinations, LTD Analysts III interview claimants, communicate with doctors' offices and employers, gather medical records, review and assess medical and lab reports, review policy agreements and communicate with specialists at The Hartford.   (F 52:3-14) (G 16:24-17:3). LTD Analysts III must be able to read the long term disability policy and interpret it within the context of a claim. (G 16:21-23). LTD Analysts III determine whether a claimant meets the definition of "disability" as set forth by the long term disability policy. (G 16:24-17:1) (F 51:19-52:3). They decide whether the claimant meets the elimination period under the policy.  (G 48:12-17).  This process is very complex and is

---

[1] Depositions are cited to by the initial of the deponent's last name, page number and line number(s). The following initials are used for the deponents: Hollinger = "H"; Rosario = "R"; Paylor = "P"; Glass = "G"; Ford = "F"; Hancock = "H"; Smith = "S"; and Crump = "C". All deposition transcripts are attached as Exhibit A.

dependent upon an understanding of the contract and the various circumstances involving the claimant's return to work and date of disability.  (G 48:18-49:20).  They make decisions with regard to the claimant's ability to perform his or her own occupation.  (G 17:11-13).  They also decide whether a claimant meets "test change," which occurs when a claimant moves from the inability to perform his or her own occupation to the inability to perform any occupation.  (G 17:24-18:4).  LTD Analysts III determine whether a claimant has rehabilitation potential and, if so, refers the claim to the rehabilitation case managers. (G 17:14-16).  LTD Analysts III also assess whether there is potential fraud with a claim and, if so, refer the claim to the investigative unit. (G 17:20-23). According to Hollinger and Paylor, all Ability Analysts III had the same job duties. (P 69:22-70:7) (H 113:8-11).

## II.  PAYLOR'S EMPLOYMENT WITH THE HARTFORD.

### a.  PAYLOR'S JOB DUTIES.

Paylor was employed by the Hartford from February 2004 until September 2009.  (P 96:20-24).  During her employment, Paylor reported to Long Term Disability Team Leaders Nicole Hancock and Kelly Smith.[2] (P 34:15-20). Hancock and Smith reported to Rutledge Crump, Director of Long Term Disability. (C 13:16-14:4).  Paylor's salary at the time of her termination was $41,200. (P 63:20-23). Paylor understood her salary was compensation for all hours worked. (P 97:15-20).

---

[2] In June/July 2009, Hancock transferred to a leadership role in the contact center. (H 31:1-5, S 35:10-14).  In August 2009, Smith began supervising Hancock's former team. (S 8:22-25). Rutledge Crump informed Smith that while she was going to take over Hancock's former team, she would not be responsible for Paylor's performance issues as discipline was already in progress at that time, and Paylor was being issued a written warning. (S 16:17-17:4, 20:17-22).

As an LTD Analyst III, Paylor performed office or non-manual work. (P 25:7-10). Her work related to people who were insured by The Hartford.  (P 25:11-13).  She was responsible for investigating and analyzing claimants' cases for long term disability benefits and deciding whether there was coverage for a claim. (P 24:23-25:25, 31:4-33:1, Ex. 1). Paylor exercised independent, professional judgment in interpreting policies.  (P 122:11-122:13). She had authority to approve claims where the initial amount paid to the claimant was $2,500 or less per month and had the authority to authorize additional monthly payments on the same claim beyond the initial $2,500 payment. (P 26:14-18, 27:7-16, 28:3).

When Paylor received a claim, she would set up the file, gather information on the policy and the claimant, interview the claimant, physicians and employer and evaluate the claim based upon the information she received. (P 24:5-13, 25:14-22).  She utilized guidelines on medical conditions and injuries when making claim determinations.  (P 121:11-122:13; 127:13-19). Paylor partnered with medical case managers to analyze complex medical information and the functional abilities of customers to evaluate their ability to return to work. (P 31:4-33:1, Ex. 1). Paylor also worked with vocational rehabilitation consultants to help return customers to work in positions they were capable of performing. (*Id.*).  If Paylor had all of the information she needed, she would pay the claim.  (P 24:14-15). If there were questions regarding a disability, Paylor would refer the claim to a nurse or a specialist to determine if the claim was payable.   (P  24:19-22). Paylor also made recommendations as to the settlement of claims, which were approved at least 50% of the time. (P 30:11-13).

**b. PAYLOR'S POOR PERFORMANCE AND RESIGNATION.**

In 2008, Paylor began struggling with meeting performance expectations.  (H 33:1-3).  Paylor received a mid-year performance evaluation dated August 28, 2008, for the performance period of January 2008 through June 2008.  (P 43:25-44:12, Ex. 5).  Paylor's mid-year performance evaluation noted that she needed to "improve overall quality and reserve accuracy" and "demonstrate[] the ability to maintain metrics with minimum follow up by management."  (P 43:25-44:12, Ex. 5). Paylor's mid-year performance evaluation also noted that she was "not effectively managing her ongoing caseload."  (P 43:25-44:12, Exhibit 5).   Paylor agreed with the evaluation.  (P 44:13-19).

On February 27, 2009, Paylor received an annual performance evaluation which rated her performance from January 1, 2008 to December 31, 2008 as "inconsistent."  (P 40:4-16, Ex. 4). The performance evaluation noted that Paylor "has struggled with making timely claim decisions…[and her] overall QA and reserve accuracy is below the standard." (P 40:4-16, Ex. 4).   Paylor was to show improvement in her overall quality and reserve accuracy, focus on making timely claim decisions and maintain metrics with minimal follow up by management.  (*Id*). Paylor did not express disagreement with the evaluation when she received it.  (P 40:17-21). Paylor attributes her performance issues to stress in her personal life and the number of hours she was working. (P 42:7-23).

Paylor's performance did not improve in 2009. (H 33:1-6). Paylor was counseled by her manager about continuing errors in her files. (P 46:4-6, 49:5-14, Ex. 7).  Paylor attributes her ongoing performance errors to stress in her life and does not deny that she had errors in her files.  (P 48:24:49:4, 49:22-50:5).  Due to Paylor's continued performance issues, the

decision was made to issue Paylor a written warning with a performance improvement plan. (H 85:22-25). On August 21, 2009, Hancock emailed Crump a rough draft of an assessment of Paylor's performance and the performance improvement plan.  (C 49:16-23, 53:22-55:13, Ex. 1). On August 26, 2009, Crump forwarded Hancock's email to Amy Dorris, Employee Relations.   (C 50:5-24, Ex.1).   On September 11, 2009, Paylor was issued the written warning.  (H 96:5-10).

Paylor was given two options as part of the written warning.  (P 51:16-19, Exhibit 7). Paylor could either (1) show improvement in her performance over the next 60 days, or (2) she could choose to waive the opportunity to improve her performance and elect instead to immediately end her employment with The Hartford in exchange for a severance opportunity.[3]  (Id.). Paylor chose to resign her employment in exchange for a severance payment in lieu of improving her performance. (P 51:20-52:9, 95:7-19).  Paylor's last day worked was September 16, 2009. (P 53:15-21).   That same day, Paylor received the separation agreement (the "Agreement").  (P 60:20-21).   Paylor signed the Agreement the following day, on September 17, 2009.  (P 52:14-53:1, 62:22-23 Ex. 8).[4]

Pursuant to the Agreement, Paylor received thirteen (13) weeks of severance pay.  (P 53:22-25, Ex. 8).[5]  The severance was paid to Paylor via continuing periodic payments, from

---

[3] Severance plans may be offered to employees who have ongoing performance deficiencies and are on progressive discipline. (C 99:1-11).  The severance plan may be offered at either the first written warning or the final written warning.  (Id.).  If an employee violates company policy, the employee is not offered a severance plan.  (Id).  The manager who authors the written warning decides whether to include a severance plan in the written warning. (C 115:12-16).

[4] Although the agreement identifies Paylor's last day worked as September 23, 2009, Paylor testified that her last day worked was September 16, 2009, and September 23, 2009, refers to the date through which she was paid.  (P 53:15-21).

[5] The Hartford intends to seek repayment of the severance payment made to Paylor, along with attorneys' fees and costs incurred in this matter, pursuant to Section 5.9 of the Agreement.  (P Ex. 8).

September 24, 2009, through December 23, 2009, during which time she also continued to receive employment benefits.  (P Ex. 8).  In exchange for the severance pay and benefits, Paylor agreed to release The Hartford from any and all claims she had against the company, including claims under the FMLA.  (P 56:18-57:3, Ex. 8 Sec. 6.5).  Paylor understood at the time she signed the Agreement that she was releasing The Hartford from any claim that she had against the company in exchange for a sum of money.  (P 58:10-18, 57:4-9, 62:8-15).  Paylor affirmed she had been paid and had received all leave, compensation, wages, bonuses and/or benefits to which she was entitled and acknowledged that no other compensation wages, bonuses, or benefits were due to her.  (P 61:7-22, Ex. 8 Sec. 6.3). Paylor also affirmed that she had been provided and not been denied any leave requested under the FMLA and had not been retaliated against for taking leave.   (P 52:13-53:1, Ex. 8 Sec. 6.5).

At the time Paylor executed the Agreement, she was 56 years old. (Interrogatory Responses, No. 2).[6] She had attended high school and a college program working towards her GED.  (P 11:25-12:19).  She also had worked in the insurance industry for 26 years and had taken numerous insurance courses. (Interrogatory Responses, No. 2) (P 12:20-25). Paylor was advised to read the Agreement and acknowledged that she was "able to read the language and understand the meaning and effect of this Agreement." (P 56:18-57:3, 60:24-61:3 Ex. 8 Sec. 6.7).  Paylor was advised in the Agreement to consult with a lawyer. (P 60:14-23, Ex. 8 Sec. 5.10).  The Agreement provides: "This is a legal document that includes the terms of your separation from The Hartford, your legal rights and a release of claims. You are advised to consult with an attorney prior to executing this Agreement."  (P 56:18-

---

[6] Paylor's Interrogatory Responses are attached as Exhibit B.

57:3 Ex. 8 Sec. 5.10).  Paylor acknowledged that she "had a reasonable time to review and consider [the] Agreement…[and] could have had more time up to and including twenty-one (21) calendar days" to review and consider the Agreement.  (*Id.* Sec. 6.8).

According to Paylor, she had no choice but to sign the Agreement because she could not deal with the stress that she was under and the additional stress she would have been under to comply with the performance improvement plan.  (P 88:18-89:8).  She just "knew that from the beginning" she could not comply with the performance improvement plan because "it was too much" so she elected to sign the Agreement.  (P 89:1-11).

### c.  PAYLOR'S FMLA LEAVE.

Paylor requested and was approved for FMLA leave on various occasions between January 2008 and September 2009, during which time she took a total of 390 hours of FMLA leave.  (P 73:12-77:16, 79:15-80:22, 110:19-22, Ex. 10-13).  All of Paylor's FMLA requests were approved, and she was never denied leave.  (P 80:14-22, 110:4-6).

In or around August/September 2009, Paylor requested FMLA leave through HartLeave.[7]  (Interrogatory Responses, No. 18).  On September 4, 2009, Paylor was notified by HartLeave that her FMLA leave request from September 16, 2009 through March 15, 2010, had been approved.  (P 77:6-16, 79:1-4).  Paylor believes The Hartford interfered with her FMLA leave and retaliated against her for requesting FMLA leave by issuing her the written warning in September 2009.  (P 101:10-20, 104:6-19).  Paylor does not "know why"

---

[7] If an employee seeks to take leave under the FMLA, the employee is to contact HartLeave.  (C 16:2-8) (H 20:18-20) (P 84:19-20) (F 22:18-24).  HartLeave is a third party vendor that handles all FMLA leave requests for employees at The Hartford. (Crump 16:2-8) (Dorris Affidavit ¶4).  The Affidavit of Amy Dorris is attached as Exhibit C.  HartLeave personnel are not employed by The Hartford.  (Dorris Affidavit ¶4).  HartLeave will email an employee's manager informing the manager that the employee has requested and/or been approved for leave.  (S 41:6-43:15) (C 16:1-24) (F 22:18-23:2).

The Hartford would discipline her after she requested leave. (P 103:7-10). Paylor's supervisors did not do or say anything to make her feel like she would be disciplined if she requested leave. (P 103:13-16). Paylor also believes she was denied a transfer request because of her FMLA leave. (P 104:20-105:5). Paylor had not yet applied for leave when she requested and was denied the transfer. (P 105:6-11, 107:17-108:5).

## III.  HOLLINGER'S EMPLOYMENT WITH THE HARTFORD.

### a.  HOLLINGER'S JOB DUTIES.

Hollinger began working at The Hartford in March 2006. (H 37:20-25). In November 2008, she became a LTD Analyst III. (H 40:5-17). Hollinger reported to Team Leader Eileen Glass. (H 40:21-23). As an LTD Analyst III, Hollinger was paid an annual salary of $37,000 and understood that her salary was compensation for all hours worked. (H 42:8-43:1-3). Hollinger received four weeks of training when she became an LTD Analyst III. (H 41:13-20). During Hollinger's training, she learned how to process and review long term disability claims, analyze policies, read and interpret long term disability contracts, assess medical information, determine if an individual meets the definitions set forth in the contract and analyze income benefits such as social security and other set-off amounts. (H 60:18-23) (G 23:16-24).

As an LTD Analyst III, Hollinger performed office or non-manual work. (H 43:6-9). The work Hollinger performed related to people who were insured by The Hartford. (H 43:10-12). Hollinger investigated and analyzed claimants' cases for disability benefits. (H 59:11-60:2, Ex. 2). Hollinger evaluated claims, made recommendations on whether the claim should be approved or denied and handled claims where the monthly benefits to be paid to

the insured exceeded $2,000. (H 43:23-24, 44:2-7, 46:5-7).   Hollinger was to evaluate the facts in the context of the insurance contract to make coverage decisions.   (H 43:13-16, 59:11-60:2, Ex. 2).  She interviewed clients, employers and physicians to gather information. (H 59:11-60:2, Ex.2). She partnered with medical case managers to analyze complex medical information and the functional abilities of claimants to evaluate their ability to return to work.   (*Id.*).  She also worked with vocational rehabilitation consultants to help return claimants to work in positions they were capable of performing.  (*Id.*).

When Hollinger received a claim, she would (1) print out the policy; (2) assemble the file; (3) contact the claimant; (4) prepare an action plan; (5) request medical information; (6) determine if additional medical information was needed; (7) request information from the employer; (8) review and analyze the information obtained; (9) compare information regarding job duties with medical information and make assessments as to whether a claimant could work; (10) seek input from nurse practitioners, if needed; (11) determine if benefits were available under the policy; and (12) decide if the claim needed to be reviewed by occupational specialists and nurse practitioners.  (H 48:2-4-50:7, 54:24-55:2).

### b. HOLLINGER'S TERMINATION FOR DIARY DELETIONS.

When an Ability Analyst III receives a new claim, diary entries, which identify tasks that need to be completed, are assigned to the claim. (H 68:10:19). Diaries are used to manage work and provide a timely "to do" list for the claim. (G 52:20-25, 54:3-4).  Diaries are set either automatically by the system or by the analyst, team leader or clinical person. (C 104:5-8) (G 53:1-24). Analysts are to perform the activity listed in the diary.  (G 53:14-16). Diaries constitute permanent company records and deletions of diary entries are not

permitted.  (Dorris Affidavit ¶8). When an analyst deletes a diary entry, it means the analyst deleted the reminder to perform the task and the work was not completed on the file. (C 104:11-13). Depending on the severity of the diary deletion, an employee may be terminated on the first offense. (C 104:14-16).[8]

In September/October 2009, Glass found, during a routine managerial review of Hollinger's claims, that Hollinger was deleting diary entries. (G 64:6-19). Per company practice, Glass began an investigation and found approximately 19 diary deletions.[9] (G 63:24-64:1, 90:17-22).  Glass reported the issue to Crump. (G 65:8-17).  Glass and Crump discussed the diary deletion issue and other problems Hollinger had exhibited such as delayed claim handling, gaps in handling, and failure to send required letters. (G 66:3-67:7). Glass then contacted Employee Relations to discuss these issues. (G 67:8-20, 68:4-15). The diary deletion issue was of immediate concern to Employee Relations. (G 68:19-69:2).

On October 27, 2009, a meeting was held with Hollinger to discuss the diary deletions and to allow Hollinger an opportunity to explain what occurred.  (H 72:14-73:24, 77:25-78:12) (G 69:3-12, 70:12-17).  Hollinger stated that she had too much work and she thought it was permissible to delete the diary entries. (G 70:21-71:11).  Hollinger indicated that she would need to review the claims at issue to respond to each incident.  (H 73:9-25). That same day, Glass provided Hollinger with examples of the diary deletions and claim handling issues and afforded Hollinger an opportunity to prepare a written response.  (G 72:3-10)  (H 73:12-74:5, 77:25-78:12 Ex. 6, 7).

---

[8] Progressive discipline is not used for diary deletion issues.  (C 108:20-23).
[9] The system shows the date the diary was deleted and who deleted the diary.  (C 105:8-12) (G 82:21-23).

Based on Hollinger's deletion of multiple diaries, her employment with The Hartford was terminated.  (G 8:5-23). The decision to terminate Hollinger was made on October 29, 2009, by Employee Relations.  (Dorris Affidavit ¶5).  Hollinger did not report to work from October 29, 2009, to November 3, 2009.  (H 82:18-25) (Dorris Affidavit ¶6). On November 4, 2009, Rutledge Crump informed Hollinger by telephone that her employment was terminated due to diary deletions. (H 78:25-79:10).  Hollinger does not deny deleting diary entries. (H 77:15-24).  Hollinger acknowledges that she was advised during her employment that deleting diaries was improper, and is aware of two other LTD Analysts III who were terminated for diary deletion. (H 88:1-89:14).

    **c.  HOLLINGER'S FMLA LEAVE.**

Hollinger was granted leave under the FMLA on various occasions throughout her employment and took 400 hours of FMLA leave from April 5, 2008 to June 15, 2008.  (H 121:24-123:20, Exhibit 10). All of Hollinger's FMLA leave requests were granted, and she was never denied leave.  (H 124:8-15, 132:17-19).  Hollinger contends that the only time The Hartford interfered with her FMLA rights is when she was terminated. (H 132:20-133:3). Hollinger requested short term disability leave on October 31, 2009, due to stress in her personal life.  (H 81:15-19, 81:25-82:17). Hollinger did not request FMLA leave at this time. (H 81:12-19).  However, Hollinger's short term disability claim was also treated as a request for leave under the FMLA and approved. (H 85:9-21). Hollinger believes she was terminated for taking FMLA leave because she was never written up and there had been no prior complaints regarding her work. (H 133:18-134:12).  However, Hollinger admits she does not know "exactly why" the decision to terminate her employment was made, and she does not

deny deleting diary entries. (H 77:15-24, 133:18-134:15).  Hollinger does not know when the termination decision was made, who was involved in the decision or who made the actual decision.  (H 80:8-16).

## IV.   ROSARIO'S EMPLOYMENT WITH THE HARTFORD.

### a.   ROSARIO'S JOB DUTIES.

Rosario was hired by The Hartford in 2005 or 2006. (R 41:3-6). Rosario reported to Team Leader Warren Ford. (F 16:8-10). Rosario was paid a salary between $36,000 and $38,500 and understood her position was exempt and that her salary was compensation for all hours worked. (R 129:4-20).  As an LTD Analyst III, Rosario attended training where she learned how to administer long-term disability claims, communicate with claimants and determine if someone was disabled.  (F 15:7-16:1).  Rosario performed office or non-manual work. (R 42:25-43:1). The work she performed related to Hartford's policyholders and customers. (R 43:2-13). Rosario investigated and analyzed claimants' cases for disability benefits and decided whether to grant or deny a claimant benefits. (R 47:19-23, 53:15-25, 58:10-12, 65:13-21, 66:18-25; 67:1-10, Ex. 1).  Rosario was responsible for approving claims up to her authority limit of more than $5,000 or making recommendations for approval beyond her authority limit. (R 55:17-24, 57:19-25).  Rosario also analyzed and evaluated claims for settlement which ranged from $30,000 to $40,000.  (R 47:24-50:21, 51:13-17). She would obtain approval from her supervisor to make a settlement offer, and then communicate the offer to the claimant.  (R 50:22-51:3).

When Rosario received a claim, she would conduct an in-depth interview of the claimant.  (R 43:16-21, 52:18-22).  She would communicate with clients, physicians and

employers to gather information and explain the benefits available under the policy as well as what they can expect during the claim process. (R 65:13-21, 66:18-25, 67:1-10, Ex. 1). She also requested information from insureds, obtained medical information, and reviewed medical records. (R 44:1-3). Because every case is different, she decided what information was needed based on her interviews and the information already on file. (R 44:19-25; 45:1-22). Where records did not make sense, she might consult with one of the nurses, but she was not required to do so. (R 53:5-7-12). Rosario also partnered with medical case managers to analyze complex medical information and the functional abilities of claimants to evaluate their ability to return to work. (R 65:13-21; 66:18-25; 67: 1-10, Ex. 1). She also worked with vocational rehabilitation consultants to help return customers to work in positions they were capable of performing. (R 65:13-67:10, Ex. 1). She made recommendations on whether someone qualified as disabled under a policy, and her recommendations were accepted more than 50% of the time. (R 65:1-4). Rosario evaluated all of the information she received in the context of the insurance contract to make coverage decisions. (R 65:13-21; 66:18-25; 67: 1-10, Exhibit 1). If she approved a claim within her authority limit, the claimant would begin receiving benefits. (R 55:11-16).

**b. ROSARIO'S TERMINATION FOR SUNDOWN RULE VIOLATIONS.**

During Rosario's employment, Ford counseled Rosario during one-to-one meetings on her sub-standard performance. (F 46:3-21). Ford discussed the metrics where she was falling short and would provide her with suggestions on how to improve those deficiencies. (F 46:16-21). On February 24, 2009, Ford advised Rosario during a one-to-one meeting that

he had found a violation of The Hartford's "sundown rule" when he conducted an audit of her claims.  (R 102:18-103:1, Ex.7).

Pursuant to the sundown rule, if a call is received before 2:00 p.m., the call must be returned before the end of business that day. (C 19:3-14) (R 101:22-102:12).   If a call is received after 2:00 p.m., the call must be returned by Noon the following day.  (C 19:3-14) (S 62:14-20).  Employees are made aware of the sundown rule during new hire training and reminders are sent periodically. (C 92:24-93:14). If an employee receives a call before 2:00 p.m., but has to leave the office unexpectedly, the employee is not required to return the call by 5:00 p.m. as the employee is out of the office.  (C 19:17-20:15).  When an employee is out of work, the employee is not held accountable for the sundown rule for the time not at work. (C 90:6-10).  Instead, the employee is to return the calls when he or she returns to work. (C 90:11-12) (S 65:2-6).  If an employee is out of work for several days and cannot return all of their calls on the day the employee returns to work, the employee is to notify his or her team leader.  (C 23:18-24:24).

After Ford met with Rosario on February 24, 2009, Ford found additional sundown rule violations by Rosario and informed her of the violations on March 3, 2009.  (R 103:5-9). As a result of these additional sundown rule violations, Rosario was issued a first and final written warning on March 11, 2009. (R 101:7-22, 103:2-11 Ex. 7). When Rosario was issued the first and final warning, she was advised that her employment would be terminated if she had another sundown rule violation. (R 103:10-15).  Notwithstanding, Rosario had several additional sundown rule violations. (F 40:13-19). Ford reported these violations to Crump, and Crump and Ford contacted Employee Relations. (F 36:4-19). Employee Relations and

Crump met with Rosario to discuss the sundown rule violations and provided her with an opportunity to explain the violations.  (C 84:11-19; 85:12-16).  Rosario did not deny that she violated the sundown rule by failing to timely return the calls at issue.  (C 84:11-22).  As a result of the additional sundown rule violations, Rosario was terminated.  (R 111:10-18).

### c. ROSARIO'S FMLA LEAVE.

Rosario was approved for intermittent FMLA leave from December 6, 2007 to December 5, 2009 for migraine headaches.  (R 149:17-150:2, 153:3-11, 154:23-25 Ex.10, 11).  Rosario took a total of 390.5 hours of FMLA leave during that time period.  (R 151:20-152:1, 154:9-22 Ex. 10, 11).  Rosario was never denied FMLA leave, and she was not reprimanded or disciplined for taking leave.  (R 187:7-188:22, 190:15-17).  Rosario, however, contends Ford would make her feel "uncomfortable" about taking time off by making comments such as "oh really? You're ill again? You're going home?"  (R 187:12-188:12).  Ford, however, never refused Rosario the right to take leave.  (R 190:11-14).

Rosario believes she was retaliated against for taking FMLA leave because she was given extra work after she went on leave, her work was not distributed to other team members when she was on leave and she was terminated.  (R 190:18-191:9, 201:8-12, 202:6-11).  Rosario, however, acknowledged that other team members did not have their work distributed to others when they were out of work for non-FMLA reasons, and she was not the only employee given extra work assignments.  (R 82:8-24, 167:6-11).  Rosario believes her termination was retaliatory because it occurred shortly after her leave and it just "felt like it" (R 171:16-20, 198:19-199:13).  Rosario also believes her termination was the result of her FMLA leave because several people on her team were on FMLA leave, and an employer

would expect its employees to be there every day which she was not.  (R 198:19-199:4, 217:22-218:9).  Rosario does not know if the other people who were on FMLA leave were fired.  (R 222:5-9).

Rosario does not deny that she failed to return calls in violation of the sundown rule. (R 104:14-21, 106:14-23, 111:2-14). Rosario, however, believes that her termination was improper as there was no reason for Ford to be reviewing her calls while she was on leave or shortly after she returned from leave.  (R 112:3-7, 194:23-196:1).  Rosario also believes that the sundown rule should not have applied to her when she returned to work from FMLA leave because she had so many calls to return.  (R 103:12-104:4).  Rosario, however, does not recall if she was on FMLA leave around the time she failed to return most of the calls for which she was disciplined.  (R 105:10-22, 109:3-4).  Rather, she is simply assuming she was on FMLA leave.  (R 105:17-22). Rosario also acknowledges that the calls she failed to return and for which she was terminated occurred prior to her taking FMLA leave. (R 191:12-14).

## MEMORANDUM OF LAW

Summary judgment is warranted if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

### I.    PAYLOR HAS RELEASED HER FMLA CLAIMS AGAINST THE HARTFORD.

The Agreement Paylor signed contains a general release of all claims, including claims arising under the FMLA.  (P 56:18-13; Exh. 8). The Department of Labor has clarified that employees and employers are permitted to agree voluntarily to the settlement of past

claims under the FMLA without having first to obtain the permission or approval of the Department or a court. 29 C.F.R. § 825.220(d) ("Employees cannot waive, nor may employers induce employees to waive, their prospective rights under FMLA…This does not prevent the settlement or release of FMLA claims by employees based on past employer conduct without the approval of the Department of Labor or a court).  A waiver of past, retrospective FMLA claims is valid and enforceable.  *Lemke v. Waterloo Industries,* 2011 U.S. Dist. LEXIS 10748, * (E.D. Wis. Sept. 21, 2011); *Pappas v. Ford Motor Co.,* 2009 U.S. Dist. LEXIS 115808, *9 (E.D. Mich. December 8, 2009).

Paylor believes The Hartford interfered with her FMLA rights and retaliated against her for requesting FMLA leave when she was issued the written warning.  (P 101:10-20, 104:6-19).   Paylor was issued the written warning on September 11, 2009.  (H 96:5-10).  Paylor signed the separation agreement five (5) days later on September 17, 2009, releasing all claims, including those under the FMLA. (P 20-21, 52:14-53:1, 62:22-23, Exhibit 8).  Because Paylor signed the separation agreement *after* the alleged FMLA interference and retaliation claim arose, she knowingly waived a past, retrospective FMLA claim.  According, Paylor is precluded from asserting her FMLA interference and retaliation claims as she released The Hartford from these claims.[10]   Moreover, Paylor affirmed that she had been provided with and not denied any leave requested under the FMLA and she had not been

---

[10] The Agreement lists Paylor's separation date as September 23, 2009.  The fact that Paylor's separation date is listed after the date she signed the Agreement does not mean that Paylor released a prospective claim as she voluntarily chose to separate her employment with The Hartford prior to signing the Agreement, and she was aware at the time she signed the Agreement that her employment would be terminated with a separation date of September 23.  Paylor was clearly on notice at the time she signed the Agreement that her employment was being separated.  Because Paylor was aware at the time she signed the Agreement that her employment would be separated on September 23, she knowingly waived a past, retrospective FMLA claim.

retaliated against because of any leave.  (P 56:18-13, Ex. 8 Sec. 6.5).  The Hartford is entitled to summary judgment as to Paylor's FMLA claims as she has released these claims and acknowledged she was not denied leave or retaliated against for taking leave.

## II.  PAYLOR AFFIRMED SHE HAD BEEN PAID FOR ALL HOURS WORKED .

Paylor claims she is entitled to overtime compensation. However, in the Agreement, Paylor affirmed she was paid for all hours worked and no other compensation or wages were due to her.  (P 61:7-22).  Specifically, Paylor avowed:

> You have been paid and/or have received all leave (paid or unpaid), compensation, wages, bonuses, and/or benefit to which you may be entitled, and you acknowledge that no other leave (paid or unpaid), compensation, wages, bonuses, and/or benefits are due to you, except as provided in this Agreement.

(P 56:18-13, Ex. 8 Sec. 6.3).  The Hartford is entitled to summary judgment as to Paylor's FLSA claim as she affirmed she was paid for all hours worked and was not entitled to any other compensation.

## III.  PAYLOR'S RELEASE WAS KNOWING AND VOLUNTARY.

"Courts in the Eleventh Circuit consider six factors in determining whether a release of federal statutory claims was knowing and voluntary: (1) the plaintiff's education and business experience; (2) the amount of time the plaintiff had to consider the agreement before signing it; (3) the clarity of the agreement; (4) the plaintiff's opportunity to consult with an attorney; (5) the employer's encouragement or discouragement of consultation with an attorney; and (6) the consideration given in exchange for the waiver when compared with the benefits to which the employee was already entitled."  *Bacon v. Stiefel Labs.,* 2011 U.S. Dist. LEXIS 119654, *14 (S.D. Fla. Oct. 17, 2011).

Paylor's release was knowing and voluntary as Paylor: (1) was 56 years old at the time she executed the Agreement; (2) attended high school and a college program working towards her GED; (4) worked in the insurance industry for 26 years and had taken numerous insurance courses; (5) acknowledged she had a reasonable time to review and consider the Agreement and was provided with up to twenty-one days to review it; (6) discussed the Agreement with her husband; (7) was advised to read the Agreement and consult with a lawyer; (8) acknowledged she was able to read and understand the meaning and effect of the Agreement; and (9) received thirteen (13) weeks of severance pay in exchange for executing the Agreement.[11]  (P 11:25-12:25, 53:4-6, 56:18-57:3, 58:10-59:9, 60:14-23, 62:8-15, Exhibit 8) (Interrogatory Responses, No. 2).  The terms of the Agreement are clear as evidenced by Paylor's admission that she understood she was releasing The Hartford from any claim that she may have against the company in exchange for a sum of money.  (P 57:4-9, 58:10-15, 62:8-15).  As such, Paylor's release of her FMLA claims is enforceable as the release was knowing and voluntary.

Any contention by Paylor that the Agreement is not valid because she did not read the entire agreement is without merit.  Paylor acknowledged that she "skimmed" through the Agreement, and she did not read the entire Agreement because "she didn't care."  (P 59:16-60:7). Paylor's failure to read the entire Agreement before signing it does not invalidate the Agreement.  *See Madura v. BAC Home Loans Servicing L.P.,* 2012 U.S. Dist. LEXIS 21767,

---

[11]  As part of Paylor's employment, she was not automatically entitled to a severance plan.  (Dorris Affidavit ¶7).  Severance plans may be offered to employees who have ongoing performance deficiencies and are on progressive discipline. (C 99:1-11).  The severance plan may be offered at either the first written warning or the final written warning.  (*Id.*).  If an employee violates company policy, the employee is not offered a severance plan.  (C 99:1-15).  The manager who authors the written warning decides whether to include a severance plan in the written warning. (C 115:12-16).

*3 (M.D. Fla. Feb. 20, 2012) (absent a showing of fraud or mental incompetence, a party who signs a contract cannot avoid his obligation under the contract simply by showing that he did not read what he signed).

Any assertion by Paylor that the Agreement is not valid because she was under stress at the time she executed the Agreement is also without merit.  According to Paylor, she had no choice but to sign the Agreement because she could not deal with the stress that she was under and the additional stress she would have been under to comply with the performance improvement plan.  (P 88:18-89:8).  Paylor was advised when she received the written warning that she could either improve her performance or accept the severance.  (P 93:11-16).  Duress is not a valid defense to a contract if the moving party had an alternative to signing the agreement such as to remain in a current position rather than resign.  *See Winiarski v. Brown & Brown, Inc.,* 2008 U.S. Dist. LEXIS 35799, *8 (M.D. Fla. May 1, 2008).  Because Paylor was given an alternative to resigning, she cannot invalidate the Agreement on grounds of duress.

## IV.    PAYLOR HAS RATIFIED THE SETTLEMENT AGREEMENT.

Paylor is precluded from challenging the release because she has not tendered back the consideration provided to her under the Agreement.  "A person who signs a release, then sues his or her employer for matters covered under the release, is obligated to return the consideration."  *Faris v. Williams WPC-I, Inc.,* 332 F.3d 316, 322 (5th Cir. 2003).  "[G]eneral contract law provides that [p]laintiffs' failure to return all monies paid to them for the releases prevents them from attempting to invalidate the release agreements."  *Bacon v. Stiefel Labs.,* 2011 U.S. Dist. LEXIS 119654 (S.D. Fla. Oct. 17, 2011); *see also Gleich v. St.*

*Andrew School,* 2011 U.S. Dist. Lexis 113176, *8-9 (S.D. Ohio Sept. 30, 2011) (the tender back of consideration received for signing a release is an absolute prerequisite to avoidance of the release).  "[A] party's right to rescind is subject to waiver if he retains the benefits of a contract after discovering the grounds for rescission." *Mazzoni Farms,* 761 So. 2d 306, 313 (Fla. 2000).

Paylor has not tendered back the thirteen (13) weeks of severance pay she received in exchange for executing the separation agreement.  (Dorris Affidavit ¶7).  As such, she has ratified the release and is precluded from challenging its enforceability.

## V.  PLAINTIFFS' FLSA CLAIMS FAIL AS PLAINTIFFS' POSITION MEETS THE ADMINISTRATIVE EXEMPTION UNDER THE FLSA

### A.  THE ADMINISTRATIVE EXEMPTION UNDER THE FLSA

Plaintiffs' position, Long Term Disability Analyst III, is classified by The Hartford as an exempt administrative position under the FLSA.  An employee meets the definition of an exempt administrative employee under the FLSA if:

(1) the employee is paid on a salary basis at a rate of not less than $455 per week;

(2) the employee's primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) the employee's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

To meet the "directly related to management or general business operations" requirement, an employee must perform work directly related to assisting with the running or servicing of the business or its customers, as distinguished, from working on a manufacturing

production line or selling a product in a retail or service establishment.   29 C.F.R. §
541.201(a).  "Work directly related to management or general business operations" includes,
but is not limited to, work in functional areas such as insurance.  29 C.F.R. § 541.201(b).

In general, the "exercise of discretion and independent judgment" involves the
comparison and the evaluation of possible courses of conduct and acting or making decisions
after the various possibilities have been considered.   29 C.F.R. § 541.202(a).   The term
"matters of significance" refers to the level of importance or consequence of the work
performed.   *Id.*   The exercise of discretion and independent judgment implies that the
employee has authority to make an independent choice, free from immediate direction or
supervision.   29 C.F.R. § 541.202(b).   Employees can exercise discretion and independent
judgment even if their decisions or recommendations are reviewed at a higher level.   *Id.*

"Factors to consider when determining whether an employee exercises discretion and
independent judgment with respect to matters of significance include, but are not limited to:
whether the employee has authority to formulate, affect, interpret, or implement management
policies or operating practices;  whether the employee carries out major assignments in
conducting the operations of the business;  whether the employee performs work that affects
business operations to a substantial degree, even if the employee's assignments are related to
operation of a particular segment of the business;  whether the employee has authority to
commit the employer in matters that have significant financial impact;  whether the employee
has authority to waive or deviate from established policies and procedures without prior
approval;  whether the employee has authority to negotiate and bind the company on
significant matters;  whether the employee provides consultation or expert advice to

24

management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances." 29 CFR 541.202(b).

### B. THE ADMINISTRATIVE EXEMPTION IN THE INSURANCE INDUSTRY.

The Hartford is a leading provider of insurance and investment products. (Dorris Affidavit ¶3). The Hartford offers various lines of insurance products to its customers, including long term disability insurance. (Dorris Affidavit ¶3). Plaintiffs were employed by The Hartford as LTD Analysts III and were responsible for investigating and analyzing customers' cases for long term disability benefits. (P 31:4-33:1, Ex. 1) (H 59:11-60:2, Ex. 2) (R 65:13-21, 66:18-25, 67:1-10, Ex. 1).

### 1. CODE OF FEDERAL REGULATIONS ADDRESSING THE EXEMPT STATUS OF INSURANCE ADJUSTERS.

Pursuant to 29 C.F.R. 541.203: "Insurance claims adjusters generally meet the duties requirements for the administrative exemption, whether they work for an insurance company or other type of company, if their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation." The regulation does not require adjusters to perform each and every activity listed. *See Robinson-Smith v. Gov. Employees Insur. Co.,* 2010 U.S. App. LEXIS 103, * 19 (D.D.C. 2010).

2.      DOL OPINIONS AND CASE LAW ADDRESSING THE EXEMPT STATUS OF INSURANCE ADJUSTERS.

In a November 19, 2002, Department of Labor ("DOL") Wage and Hour Division opinion letter, a copy of which is filed herewith as Exhibit D, the DOL opined that insurance adjusters qualified for the administrative exemption under the FLSA. The adjusters were primarily involved with the investigation and evaluation of insurance claims, which included gathering facts by interviewing the insured, witnesses, and physicians; visiting the scene of the event; inspecting property damage; weighing factual information and preparing damages estimates; evaluating whether there was coverage of a claim under the policy; establishing the level of company reserves for a claim; negotiating settlements with the insured or with the third-party claimant; and if the claim resulted in litigation, the adjuster collaborated with counsel and made recommendations in preparation for litigation. The DOL found that the adjusters performed many duties related to servicing the employer's business, such as planning the processing of a claim from the beginning to the end, representing the company, advising management throughout the claim process, and negotiating on behalf of the company with the claimant. Because the duties involved servicing the insurance company, the adjusters' duties were administrative in nature. The claims adjusters' duties involved work of substantial importance to the management or operation of the business of the employer as the adjusters possessed full and final authority to settle claims within their settlement authority and made decisions as to fault or liability which affected both the policyholders and the company's legal rights and obligations.

The DOL opined that insurance adjusters exercised discretion and independent judgment as they had complete discretion and independent judgment with regard to all claims

within their established settlement authority and made all relevant decisions regarding coverage and liability.  The adjusters were found to be exercising a great deal of discretion in deciding how to handle claims and were not merely pursuing a standardized format for resolving claims.  The adjusters were using their own judgment to determine who was liable, what the claim was worth, and how to handle the negotiations.

In *Jastremeski v. Safeco Insur. Co.,* the court held that an insurance adjuster who was responsible for contacting the claimant on an assigned claim, verifying coverage either using his own judgment or using the help of a manager or underwriter, planning the investigation, conducting interviews and gathering facts, reviewing the policy to determine if the claimed loss was covered, determining the dollar value of the claim, informing the insurance company of the amount the adjuster determined as the value of the loss, and negotiating settlements within a specific authority was an exempt administrative employee under the FLSA.  243 F. Supp. 2d 743 (D. Ohio 2003); *see also In re Farmers Insur. Exchange,* 481 F.3d 1119 (9th Cir. 2007) (claims adjusters who performed activities such as interviewing witnesses, making recommendations regarding coverage and the value of claims, determining fault, and negotiating settlements were deemed to fall within the administrative exemption under the FLSA).

Likewise, in *Robinson-Smith v. Govt. Employees Insur. Co.,* the court held that automobile claims adjusters were exempt where the adjusters determined how much the insurance company should pay to restore a vehicle to its pre-loss condition, interviewed the insured, determined whether damage was caused by a covered event, recommended that payment be withheld on a claim if damage did not result from a covered loss, negotiated with

claimants and body shops and settled claims within their authority level, checked for indicia of fraudulent claims, and determined whether to repair or replace a part.  2010 U.S. App. LEXIS 103 (D.D.C. Jan. 5, 2010).  The court explained that even if the vast majority of the adjusters' work consisted of using their training and skills to assess the value of the damage to the vehicle in accordance with the standards set forth by the insurance company, the adjusters' duties included work requiring the exercise of discretion and independent judgment as to matters of significance.  *Id.*

**C.  PAYLOR WAS AN EXEMPT, ADMINISTRATIVE EMPLOYEE.**

The first prong of the administrative exemption is satisfied as Paylor was paid a salary of $41,200, which is a salary rate of not less than $455 per week. (P 63:20-23).

The following tasks performed by Paylor are the same or virtually identical to the duties set forth in 29 C.F.R. § 541.205 and the November 19, 2002 DOL Opinion and cases cited above: (1) interpreting insurance policies; (2) determining whether there is coverage for a claim; (3) approving claims within her authority limit; (4) making accurate and timely claim decisions and appropriate benefit calculations; (5) ascertaining the amount of disability benefits to be paid to the claimant; (6) paying claims; (7) gathering information on the policy and claimant; (8) interviewing the claimant, physicians and employer; (9) evaluating the claim based upon the information received; (10) analyzing and assessing medical information; (11) determining whether a claimant meets various definitions defined under the policy; (12) complying with turnaround time standards, adhering to ERISA requirements and sending timely correspondence to claimants;  (13) referring claims to a nurse or a specialist, if needed, to determine if a claim was payable; (14) partnering with medical case managers to

analyze complex medical information to evaluate a claimant's ability to return to work; (15) working with vocational rehabilitation consultants to help return claimants to work in positions they were capable of performing; (16) recommending settlement of claims; and (17) assessing potential fraud with a claim. (P 24:5-25:22, 30:11-31:4-33:1) (G 16:24-18:19, 50:1-51:8, 56:4-12)  (F 51:19-52:14).

Paylor performed office or non-manual work.  (P 25:7-10).  Her work related to the people who were insured by The Hartford.  (P 25:11-13).  Paylor's duties managing assigned claims, representing The Hartford throughout the claims process, making timely decisions on behalf of The Hartford, and ensuring that benefits were paid correctly are administrative in nature.  Paylor's duties of making claims determinations and ensuring payments involve work of substantial importance to the management or operation of The Hartford and its customers.  Paylor's job duties of determining eligibility for long term disability benefits for employees of The Hartford's customers involves work directly related to the business operations of The Hartford and its customers.  As such, Paylor's job meets the second prong of the administrative exemption test in that her primary duties involved the performance of office or non-manual work directly related to the management or general business operations of The Hartford and its customers.

Paylor's primary duties also included the exercise of discretion and independent judgment with respect to matters of significance as Paylor independently investigated and analyzed customers' cases for long term disability benefits, interpreted policies, determined appropriate strategies in the claim process, and made decisions regarding whether there was coverage for a claim.

### D.  HOLLINGER WAS AN EXEMPT, ADMINISTRATIVE EMPLOYEE.

The first prong of the administrative exemption is satisfied as Hollinger was paid a salary of $37,000 a year, which is at a rate of not less than $455 per week.  (H 42:8-10).

The following tasks performed by Hollinger are the same or virtually identical to the duties set forth in 29 C.F.R. § 541.205 and the November 19, 2002 DOL Opinion and cases cited above: (1) evaluating facts in the context of the insurance contract to make coverage recommendations; (2) determining whether the claim should be approved or denied; (3) determining if benefits were available under the policy; (4) interviewing clients, employers and physicians to gather information; (5) partnering with medical case managers to analyze complex medical information to evaluate claimants' ability to return to work; (6) working with vocational rehabilitation consultants to help return claimants to work; (7) preparing an action plan; (8) requesting medical information and job duties information; (9) analyzing all information received and determining whether additional information was needed; (10) comparing information regarding job duties with medical information and making assessments as to whether a claimant could work; (11) deciding if the claim needed to be reviewed by occupational specialists and nurse practitioners; (12) determining whether a claimant meets various definitions defined under the policy; (13) complying with turnaround time standards, adhering to ERISA requirements and sending timely correspondence to claimants; and (14) assessing potential fraud with a claim. (G 16:24-18:19, 50:1-51:6, 56:4-12)  (F 51:19-52:14) (H 43:13-46:7, 48:2-50:7; 54:24-55:2, 59:11-60:2, Ex. 2).

The work Hollinger performed related to people who were insured by The Hartford and was office or non-manual work. (H 43:6-12). Hollinger's duties managing assigned

claims, representing The Hartford throughout the claims process, making timely decisions on behalf of The Hartford, and determining if benefits were available under the policy are administrative in nature. Hollinger's duties of making coverage recommendations and determining the availability of benefits involve work of substantial importance to the management or operation of The Hartford and its customers. Hollinger's job duties of determining eligibility for long term disability benefits for employees of The Hartford's customers involves work directly related to the business operations of The Hartford and its customers.  As such, Hollinger's job meets the second prong of the administrative exemption test in that her primary duties involved the performance of office or non-manual work directly related to the management or general business operations of The Hartford and its customers.

Hollinger's primary duties also included the exercise of discretion and independent judgment with respect to matters of significance as Hollinger independently investigated long term disability claims, determined an action plan for the claim process, determined if benefits were available and made coverage recommendations.  (H 43:13-14-46:7, 48:12-14, 50:1-7, 59:11-60:2, Ex. 2).

**E.  ROSARIO WAS AN EXEMPT, ADMINISTRATIVE EMPLOYEE.**

The first prong of the administrative exemption is satisfied as Rosario was paid a salary between $36,000 and $38,500 a year, each of which is at a rate of not less than $455 per week.  (R 129: 4-12).

The following tasks performed by Rosario are the same or virtually identical to the duties set forth in 29 C.F.R. § 541.205, the November 19, 2002 DOL Opinion and the cases

cited above: (1) evaluating facts in the context of the insurance contract to make coverage decisions; (2) conducting in depth interviews of claimants; (3) communicating with employers to gather information and explaining to claimants the benefits available under the policy; (4) requesting medical information; (5) reviewing and assessing medical records; (5) deciding what information was needed based on interviews and the information she had on file; (6), consulting with nurses where medical records were unclear; (7) partnering with medical case managers to analyze complex medical information and evaluate a claimant's ability to return to work; (8) working with vocational rehabilitation consultants to help return customers to work; (9) recommending whether someone qualified as disabled; (10) evaluating claims for settlement; (11) making accurate and timely claim decisions and appropriate benefit calculations; (12) ascertaining the amount of disability benefits to be paid to the claimant; (13) determining whether a claimant meets various definitions defined under the policy; (14) complying with turnaround time standards, adhering to ERISA requirements and sending timely correspondence to claimants; (15) assessing potential fraud with a claim. (G 16:24-18:19, 50:1-51:6, 56:4-12)  (F 51:19-52:14) (R 43:16-21, 44:1-3, 47:24-25, 48:1-16, 50: 9-11, 52:18-22, 53:5-9, 65:1-21; 66:18-25; 67: 1-10, Ex. 1).

Rosario performed office or non-manual work. (R 42:25; 43:1). The work she performed related to Hartford's policyholders and customers. (R 43:2-13). Rosario's duties managing assigned claims, representing The Hartford throughout the claims process, making timely decisions on behalf of The Hartford, and ensuring that benefits were paid correctly are administrative in nature.  Rosario's duties of making claims determinations and determining benefits involve work of substantial importance to the management or operation of The

Hartford and its customers. Rosario's job duties of determining eligibility for long term disability benefits for employees of The Hartford's customers involves work directly related to the business operations of The Hartford and its customers. As such, Rosario's job meets the second prong of the administrative exemption test in that her primary duties involved the performance of office or non-manual work directly related to the management or general business operations of The Hartford and its customers.

Rosario's primary duties also included the exercise of discretion and independent judgment with respect to matters of significance as she investigating and analyzing customers' cases for disability benefits, decided what information was needed based on interviews and the information she had on file, evaluated the facts in the context of the insurance contract to make coverage decisions, and decided whether to grant or deny a claimant long-term disability benefits.

## VI.   PLAINTIFFS' FMLA INTERFERENCE AND RETALIATION CLAIMS

The FMLA "makes it illegal for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" rights provided under the FMLA. *Pereda v. Brookdale Senior Living Cmtys., Inc.*, 666 F.3d 1269, 1273-1274 (11th Cir. 2012). "'A plaintiff claiming interference must demonstrate by a preponderance of the evidence that she was denied a benefit to which she was entitled.'" *Id.*

To make a *prima facie* showing of retaliation under the FMLA, a plaintiff must establish (1) that she engaged in activity protected by the FMLA; (2) that she was subjected to a materially adverse action; and (3) a causal connection between the activity and the adverse action. *Hamm v. Johnson Bros.*, 2008 U.S. Dist. LEXIS 54624, *10 (M.D. Fla. July

17, 2008).   If the plaintiff establishes a *prima facie* case, then the burden shifts to the employer to set forth legitimate, non-retaliatory reasons for the adverse employment action. *Jenks v. Naples Cmty. Hosp., Inc.,* 829 F. Supp. 2d 1235, 1254 (M.D. Fla. Nov. 7, 2011). "'If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'"  *Id.*  "Pretext is only proven if it is shown both that the reason was false, and that discrimination was the real reason behind the challenged action." *Jenks,* 829 F. Supp. 2d at 1254.

    **a.**  **HOLLINGER'S FMLA INTERFERENCE CLAIM FAILS AS THE HARTFORD CAN SHOW THAT HOLLINGER WOULD HAVE BEEN DISCHARGED HAD SHE NOT BEEN ON FMLA LEAVE.**

Hollinger was granted leave under the FMLA on various occasions throughout her employment with The Hartford.  (H 121:24-123:20).   Hollinger was never denied FMLA leave.  (H 124:8-15; 132:17-19). Hollinger contends The Hartford interfered with her leave rights under the FMLA when it was terminated her employment.   (H 132:20-133:3). Hollinger's FMLA interference claim fails as The Hartford can show that Hollinger would have been discharged had she not been on FMLA leave.

"The mere fact of discharging during FMLA leave by no means demands an employer be held strictly liable for violating the FMLA's prohibition of interfering with an employee's FMLA rights." *Jenkins v. Verizon Communs., Inc.,* 2009 U.S. Dist. LEXIS 28933, *14 (M.D. Fla. April 6, 2009) (summary judgment granted for defendant on employee's FMLA interference claim where defendant discharged the plaintiff for excessive

unprotected absences and tardies that were unrelated to her FMLA leave). An employer will not be liable for terminating an employee while on FMLA leave "if it can demonstrate that it would have discharged the employee had [she] not been on FMLA leave." *Farmer v. Bisk Educ., Inc.,* 2009 U.S. Dist. LEXIS 64234, *13 (M.D. Fla. July 27, 2009).

Hollinger's FMLA interference claim fails as The Hartford can show that Hollinger would have been discharged had she not been on FMLA leave. Hollinger was terminated for diary deletions. Hollinger concedes that she deleted diaries. (H 77:15-24) (G 70:21-71:11). Hollinger acknowledges that she was advised during her employment that deleting diaries was improper, and is aware of two other LTD Analyst III who were terminated for diary deletion. (H 88:1-89:14) (G 83:4-6). Prior to Hollinger's leave request, an investigation was conducted by her manager into the diary deletions, Hollinger's manager communicated with Employee Relations regarding appropriate discipline, and Hollinger's manager and Employee Relations met with her to discuss the deletions. (H 72:14-73:24, 77:25-78:12) (G 63:24-64:19, 68:4-15, 69:3-12, 70:12-17, 90:17-22). Moreover, the decision to terminate Hollinger's employment was made on October 29, 2009, which is prior to her request for leave on October 31, 2009. (Dorris Affidavit ¶5) (H 81:15-19, 81:25-82:17). Hollinger was simply notified of the termination decision after she requested leave. The Hartford has sufficiently demonstrated that Hollinger would have been discharged had she not been on FMLA leave. Accordingly, summary judgment should be granted in favor of The Hartford on Hollinger's FMLA interference claim.

**b.   HOLLINGER'S FMLA RETALIATION CLAIM FAILS AS A MATTER OF LAW.**

**i.   HOLLINGER FAILS TO ESTABLISH A CAUSAL CONNECTION BETWEEN HER FMLA REQUEST AND HER TERMINATION.**

"The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were not 'wholly unrelated.'" *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010). Hollinger cannot show that her request for leave and her termination are not wholly unrelated as the investigation that led to her termination and decision to terminate her employment occurred *prior* to her request for leave. "[I]n a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Farmer,* 2009 U.S. Dist. LEXIS at *13 (plaintiff failed to establish a causal connection where the corporate decision makers who terminated plaintiff made the decision to terminate her employment prior to plaintiff's request for FMLA leave).

As explained above, both the routine review of Hollinger's claims and the ensuing investigation concerning her diary deletions occurred prior to her leave request.  (H 72:14-78:12) (G 63:24-64:6-19, 68:4-15, 69:6-12, 70:12-17, 90:17-22).  The decision to terminate Hollinger was made on October 29, 2009.  (Dorris Affidavit ¶5).  Hollinger requested leave two days later on October 31, 2009. (H 81:15-19, 81:25-82:17).  Because the investigation into Hollinger's diary deletions and the termination decision occurred prior to Hollinger's request for leave, Hollinger fails to establish a causal connection.

Moreover, Hollinger fails to show that the decision makers had knowledge of her leave request at the time it made the termination decision.  "Generally, a plaintiff can show

36

the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Krutzig,* 602 F.3d at 1231.  Hollinger does not know who made the decision to terminate her employment nor does she know who was involved in the termination decision. (H 80:8-16).  Likewise, Hollinger does not know when the decision was made to terminate her employment.  (H 80:8-10).  Hollinger is unable to establish a causal connection between her leave request and her termination.  Consequently, summary judgment should be granted in favor of The Hartford on Hollinger's FMLA retaliation claim.

### ii. THE HARTFORD HAS PRESENTED A LEGITIMATE, NON-RETALIATORY REASON FOR TERMINATING HOLLINGER WHICH HOLLINGER FAILS TO SHOW IS A PRETEXT FOR UNLAWFUL RETALIATION.

Even if Hollinger can establish a *prima facie* case of FMLA retaliation, The Hartford has presented a legitimate, non-retaliatory reason for terminating Hollinger.  Hollinger was terminated for deleting diary entries which resulted in her failing to perform specific tasks on a claim. (C 104:11-13) (G 8:5-23).   The Hartford's decision to terminate Hollinger for deleting diary entries and thereby failing to perform her work assignments was a legitimate, non-retaliatory reason for its decision.  *Leeth v. Tyson Foods, Inc.,* 2011 U.S. App. LEXIS 25225, *12 (11th Cir. Dec. 20, 2011) (suspending employee due to employee's failure to perform work was a legitimate, non-retaliatory reason for employer's actions).

Hollinger cannot refute The Hartford's legitimate, non-retaliatory reason for her termination as she concedes that she deleted diaries.  (H 77:15-24) (G 70:21-71:11).  In *Morgan v. Orange County,* the Eleventh Circuit Court of Appeals held that the employee failed to rebut the employer's non-retaliatory reason for terminating his employment for

violation of the employer's call-in procedures where the employee conceded he violated the call-in procedures.  2012 U.S. App. LEXIS 10335, *6-8 (11th Cir. May 23, 2012). Hollinger acknowledges she deleted diary entries and was advised during her employment that deleting diaries was improper.  (H 77:15-24) (G 70:21-71:11).   Hollinger is also aware of two other LTD Analysts III who were terminated for diary deletion.  (H 88:1-89:14) (G 83:4-6).

Hollinger believes her termination was connected to her FMLA leave because she was never written up and there had been no prior complaints regarding her work; however, she does not know "exactly why" the decision to terminate her employment was made. (H 133:18-134:4-15). "Unsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion."  *Cordoba v. Dillard's, Inc*., 419 F.3d 1169, 1181 (11th Cir. 2005). "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Id.* Hollinger fails to offer any evidence showing that The Hartford's reason for terminating her employment is pretextual.   Accordingly, summary judgment should be granted in favor of The Hartford on Hollinger's FMLA retaliation claim.

c.   **PAYLOR'S FMLA CLAIMS**[12]

i.   **PAYLOR'S FMLA INTERFERENCE CLAIM FAILS BECAUSE THE HARTFORD DID NOT INTERFERE WITH HER FMLA RIGHTS.**

Paylor's FMLA interference claim fails as she cannot show The Hartford interfered with her FMLA rights. "'A plaintiff claiming interference must demonstrate by a preponderance of the evidence that she was denied a benefit to which she was entitled.'"

---

[12] As explained above, Paylor's FMLA claims have been released pursuant to the Agreement.  Notwithstanding, The Hartford addresses these claims herein, establishing additional grounds for summary judgment therefore.

*Pereda v. Brookdale Senior Living Cmtys., Inc.*, 666 F.3d 1269, 1274 (quoting *Harley v. Health Ctr. of Coconut Creek, Inc.,* 487 F. Supp. 2d 1344, 1357 (S.D. Fla. 2006)).  Paylor requested and was approved for FMLA leave on four different occasions during her employment.  (P 110:19-22).  All of Paylor's FMLA leave requests were approved, and she was never denied leave.  (P 80:14-22, 110:4-6).

Paylor cannot establish that she was denied FMLA leave as a result of the written warning.  The written warning contained a performance improvement plan which required Paylor to cure her performance deficiencies.  The written warning, however, had no effect on Paylor's FMLA leave and did not prevent Paylor from taking her leave.  As such, Paylor's FMLA rights were not interfered with by The Hartford. It was Paylor's decision to voluntarily resign her employment at the onset of her leave.  If anyone, it was Paylor, not The Hartford, who interfered with Paylor's FMLA leave as she voluntarily terminated her employment before her leave commenced.  The Hartford cannot be held liable for an FMLA interference claim based on Paylor's decision to voluntarily resign her employment.  Thus, summary judgment should be granted in favor of The Hartford on Paylor's FMLA interference claim.

### ii. PAYLOR'S FMLA RETALIATION CLAIM FAILS AS A MATTER OF LAW.

#### 1. PAYLOR'S RESIGNATION WAS NOT A MATERIALLY ADVERSE ACTION.

Paylor cannot show that her resignation was a materially adverse action.  "An employee who voluntarily resigns cannot claim that she suffered an adverse employment action under Title VII."  *Fannin v. Lemcko Fla., Inc.,* 2007 U.S. Dist. LEXIS 1267. *11-12 (M.D. Fla. 2007); *see also Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1256 (4th Cir.

1985) (holding no adverse employment action where employee voluntarily resigned); *Curby v. Solutia, Inc.,* 351 F.3d 868, 872 (8th Cir. 2003) (holding employer's acceptance of employee's resignation is not an adverse employment action). To establish an adverse employment action based on her resignation, Paylor must show she was constructively discharged.   The standard for constructive discharge is very high. "Before finding a constructive discharge, [the] court has traditionally required a high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable.'"  *Id.* at *1527.  In fact, "the standard of proof for a constructive discharge claim is higher than that for a hostile work environment claim."  *Van der Meulen v. Brinker Int'l*, 153 Fed.Appx. 649 (11th Cir. 2005).

Paylor fails to present any evidence that she was constructively discharged.  Paylor acknowledges that she was not terminated by The Hartford, but instead chose to leave the company.  (P 95:7-19).  Paylor attributes her performance issues to stress she was under in her personal life and the number of hours she was working.  (P 42:42:7-23). Paylor was advised when she received the written warning that she could either work on her performance or accept the severance. (P 93:11-16).  According to Paylor, she had no choice but to sign the Agreement because she could not deal with the stress that she was under and the additional stress she would have been under to comply with the performance improvement plan. (P 88:18-89:8).   She just "knew that from the beginning" she could not comply with the performance improvement plan because "it was too much" so she elected to sign the Agreement. (P 89:1-11). The stress Paylor suffered is insufficient to establish a constructive discharge claim.  Therefore, Paylor cannot establish her resignation was an adverse action.

### 2. PAYLOR CANNOT ESTABLISH A CAUSAL CONNECTION BETWEEN HER LEAVE REQUEST AND ANY ALLEGED ADVERSE ACTION.

Paylor cannot establish a causal connection between her request for leave and the written warning as she had been disciplined and advised on more than one occasion prior to the written warning of her performance deficiencies. "Courts have cautioned against finding causation when a plaintiff receives multiple warnings about [her] performance before [her] alleged protected activity, as this severs the causal connection necessary for a *prima facie* case." *Hall v. A T & T Mobility Services, LLC*, 2011 U.S. Dist. LEXIS 86758, *28 (M.D. Fla. August 5, 2011) (internal citations and quotations omitted).

In *Hall v. A T & T Mobility Services, LLC*, Hall received multiple warnings about her poor sales performance before engaging in protected activity and she continued to perform below required sales levels after engaging in protected activity. 2011 U.S. Dist. LEXIS at *28. The court held that an inference of causation does not arise simply from the temporal proximity between Hall's complaint of discrimination and her termination as Hall had been disciplined prior to her complaint of discrimination and was warned that termination was imminent. *Id.* at *28-29.

Prior to Paylor's request for leave, she was advised on two performance evaluations that she needed to cure her performance deficiencies, and she was counseled by her manager regarding her performance errors. (P 40:4-16, 43:25-44:12, Ex. 4 & 5). After Paylor's request for leave, she was issued the written warning as she failed to improve her performance. (H 85:22-25). As explained in *Hall,* Paylor cannot establish a causal connection between her request for leave and her written warning as she had been disciplined and advised on more than one occasion prior to the written warning of her performance deficiencies.

Paylor also cannot establish a causal connection between her request for leave and the denial of her transfer request as she admittedly had not yet applied for leave when she requested and was denied the transfer.  (P  104:20-105:5-11, 107:17-108:5).  Clearly, there can be no causal connection when the alleged adverse action precedes the protected activity. Paylor is unable to establish a causal connection between her FMLA leave and her written warning or transfer request.  As such, summary judgment should be granted in favor of The Hartford on Paylor's FMLA retaliation claim.

**3.  THE HARTFORD HAS PRESENTED A LEGITIMATE, NON-RETALIATORY REASON FOR DISCIPLINING PAYLOR WHICH PAYLOR FAILS TO SHOW IS A PRETEXT FOR UNLAWFUL RETALIATION.**

Paylor was issued the written warning as a result of her repeated performance deficiencies.  This represents a legitimate, non-retaliatory reason for The Hartford's actions. *Garcia v. DS Waters of Am., Inc.*, 2010 U.S. App. LEXIS 7473 (11th Cir. Apr. 12, 2010) (employer presented legitimate, nondiscriminatory reason for employee's termination where employee had low sales figures and exhibited poor performance).

Paylor fails to present any evidence to refute The Hartford's legitimate, non-retaliatory reason for its actions.  "Pretext is only proven if it is shown both that the reason was false, and that discrimination was the real reason behind the challenged action."  *Jenks,* 829 F. Supp. 2d at 1254.  Paylor acknowledges that she had performance issues.  (P 40:17-21, 42:7-23, 48:24-1, 49:22-50:5). Paylor fails to refute The Hartford's non-retaliatory reason for the written warning as she concedes she had poor performance.  *See Morgan,* 2012 U.S. App. LEXIS at *6-8 (employee failed to rebut the employer's non-retaliatory reason for terminating him where the employee conceded he violated the call-in procedures).   Paylor

fails to establish that the reason for her the written warning (her poor performance) is false and that retaliation was the real reason behind the written warning.

Moreover, Paylor offers nothing more than mere speculation that she was retaliated against for requesting FMLA leave as Paylor does not "know why" The Hartford would discipline her after she requested leave. (P 103:7-10).  Paylor acknowledged her supervisors never did or said anything to make her feel like she would be disciplined if she requested leave.  (P 103:13-16). Paylor's pure speculation that she was impermissibly retaliated against is insufficient to establish pretext.  *See* C*ordoba,* 419 F.3d at 1181 (speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment).  Paylor fails to offer any evidence showing that The Hartford's reason for disciplining her was pretextual.   Accordingly, summary judgment should be granted in favor of The Hartford on Paylor's FMLA retaliation claim.

### d. ROSARIO'S FMLA INTERFERENCE CLAIM FAILS AS THE HARTFORD CAN SHOW THAT ROSARIO WOULD HAVE BEEN DISCHARGED HAD SHE NOT BEEN ON FMLA LEAVE.

Rosario contends The Hartford interfered with her leave rights under the FMLA when it terminated her employment. (R 190:18-25, 201:8-12, 202:6-11).  Rosario's FMLA interference claim fails as The Hartford can show that Rosario would have been discharged had she not been on FMLA leave. An employer will not be liable for terminating an employee while on FMLA leave "if it can demonstrate that it would have discharged the employee had [she] not been on FMLA leave." *Farmer,* 2009 U.S. Dist. LEXIS at 18.

Rosario contends that she was terminated within a couple of days of her return from FMLA leave.  (R 171:16-20). In an FMLA interference case, courts examine whether the

FMLA leave was the proximate cause of the employee's termination. *Ferguson v. N. Broward Hosp. Dist.,* 2012 U.S. App. LEXIS 8677, *3 (11th Cir. Apr. 30, 2012). In *Ferguson v. N. Broward Hosp. Dist.,* the Eleventh Circuit Court of Appeals upheld summary judgment granted in favor of Broward Health on plaintiff's FMLA interference claim where Broward Health presented evidence that it had fired Ferguson because he had violated rules governing attendance and punctuality and had acted inappropriately with staff and patients. 2012 U.S. App. LEXIS at *3-4. Broward Health presented performance evaluations and discipline issued to plaintiff regarding his poor performance. *Id.* at *4. Broward Health also introduced evidence that it had twice granted plaintiff FMLA leave. *Id.* The court held that the overwhelming evidence was that plaintiff was fired for disregarding company rules, not for a request for leave that he submitted one month earlier. *Id.* at *5.

Rosario's FMLA interference claim fails as The Hartford can show that she would have been discharged had she not been on FMLA leave. Rosario was approved for and took intermittent FMLA on numerous occasions from 2007 until her termination in 2009. (R 149:17-150:2, 151:20-152:1, 153:3-11, 154:23-25). Rosario acknowledges that she was never denied leave. (R 187:7-25). Rosario was counseled and issued a first and final written warning for sundown rule violations prior to taking the FMLA leave that preceded her discharge. (R 101:7-103:11 Ex. 7). When Rosario was issued the first and final warning she was advised that her employment would be terminated if she had another sundown violation. (R 103:10-15). Notwithstanding, Rosario incurred additional sundown rule violations which resulted in her termination. The Hartford has sufficiently demonstrated that Rosario would have been discharged had she not been on FMLA leave.

Rosario does not deny that she failed to return several calls in violation of the sundown rule.  (R 104:14-21, 106:14-23, 111:2-14).   Rosario, however, believes that the sundown rule should not have applied to her when she returned to work from FMLA leave because she had so many calls to return.  (R 103:12-104:4).   Rosario's argument fails as she is requesting greater protection against termination because of her FMLA leave which is impermissible.

"FMLA interference claim cannot be supported by such requests for greater protection."  *Nealey v. Water Dist. No. 1*, 554 F. Supp. 2d 1226, 1230 (D.C. Kan. 2008).  In *Nealey v. Water Dist. No. 1,* plaintiff requested and was approved for various periods of leave under the FMLA. 554 F. Supp. 2d at 1230.   During the leave periods, defendant identified several instances of plaintiff sleeping at work.  Plaintiff received her first written warning about sleeping at work.  A week later, plaintiff was seen sleeping at her desk.  The following day, defendant placed plaintiff on leave. A few days later, plaintiff was terminated. The court held that plaintiff failed to offer any evidence to suggest that defendant lacked cause to terminate her employment because of her repeated sleeping at work. Defendant had provided plaintiff with a written warning about sleeping at work, plaintiff slept at work after receiving the warning and defendant terminated her. Had another employee engaged in similar conduct, defendant could have terminated that employee.  The court held that plaintiff was requesting greater protection against termination for sleeping because of her FMLA history which was impermissible. *Id.* at 1230-1237; *see also Harris v. HIP Adm'rs of Fla., Inc*., 2011 U.S. Dist. LEXIS 30798, *11 (S.D. Fla. March 24, 2011) (plaintiff's argument that her termination interfered with her FMLA rights because her performance improvement plan

should have been extended due to her FMLA leave failed to demonstrate a genuine issue of material fact).  Rosario's argument that the sundown rule should not have applied to her when she returned to work from FMLA because she had so many calls to return does not create a genuine issue of material fact precluding summary judgment.

Rosario believes that her termination is improper as there was no reason for Ford to be reviewing her calls, which resulted in him finding the sundown rule violations, while she was on leave or shortly after she returned from leave.  (R 112:3-7, 194:23-196:1).  Rosario acknowledges that the calls that she was terminated for occurred prior to her taking FMLA leave.  (R 191:12-14).  Rosario's argument fails as employees may be disciplined for conduct learned of while the employee is on FMLA leave.  *See Schaaf v. SmithKline Beecham Corp.,* 602 F.3d 1236, 1241 (11th Cir. 2010) (employer's demotion of employee for conduct learned of while employee was on leave was not FMLA interference); *Wu v. Se.-Atl. Beverage Corp*., 321 F. Supp. 2d 131, 13417 (N.D. Ga. 2004) (the fact that plaintiff's leave is what permitted the employer to discover the problems with plaintiff's work performance is of no consequence in proximate cause analysis). Accordingly, Rosario fails to show that she was terminated because of her FMLA leave.

Rosario also contends that her FMLA rights were interfered with because Ford would make her feel uncomfortable about taking time off.  (R 187:7-25).  Ford, however, never refused Rosario the right to take leave.  (R 190:11-14).  Rosario acknowledges that she was not reprimanded or disciplined for taking leave.  (R 188:13-22, 190:15-17).

Rosario fails to present any evidence that her FMLA rights were interfered with by The Hartford.  As such, The Hartford should be granted summary judgment on Rosario's FMLA interference claim.

### e.  ROSARIO'S FMLA RETALIATION CLAIM FAILS AS A MATTER OF LAW.

#### i.  ROSARIO FAILS TO ESTABLISH A CAUSAL CONNECTION BETWEEN HER LEAVE AND HER TERMINATION OR ADDITIONAL WORK ASSIGNMENTS.

Rosario believes she was terminated in retaliation for taking FMLA leave because her termination was shortly after her leave and it just "felt like it." (R 171:16-20, 198:19-199:13). To succeed under a retaliation theory, a plaintiff must show that the defendant intentionally discriminated against her because she engaged in activity protected by the FMLA.  *Schaaf v. SmithKline Beecham Corp*., 602 F.3d 1236, 1241 (11th Cir. 2010).  As explained above, "[c]ourts have cautioned against finding causation when a plaintiff receives multiple 'warnings about [her] performance before [her] alleged protected activity,' as this severs the causal connection necessary for a *prima facie* case." *Hall*, 2011 U.S. Dist. LEXIS at *28.

Rosario was counseled and issued a first and final written warning for sundown rule violations prior to taking her FMLA leave.  (R 101:7-103:1, Ex. 7).  When Rosario was issued the first and final warning she was advised that her employment would be terminated if she had another sundown violation. (R 103:10-15).  Notwithstanding, Rosario had additional sundown rule violations which resulted in her termination.  Rosario cannot demonstrate that her FMLA leave was the proximate cause of her termination as she was disciplined on more than one occasion for sundown rule violations prior to her FMLA leave and was advised that additional sundown rule violations may result in her termination.

Rosario believes she was retaliated against for taking FMLA leave because she was given extra work after she went on leave and her work was not distributed to other team members when she was on FMLA. (R 190:18-25, 201:8-12, 202:6-11). Rosario, however, acknowledged that other team members did not have their work distributed to others when they were out of work for non-FMLA reasons. (R 82:8-24). Rosario also acknowledged that other team members received additional work assignments, and she was not the only one who received extra work. (R 167:6-11). As such, Rosario cannot show a causal connection between the distribution of work assignments and her FMLA leave. Rosario fails to establish a *prima facie* case of FMLA retaliation. Consequently, summary judgment should be granted in favor of The Hartford on Rosario's FMLA retaliation claim

### ii. THE HARTFORD HAS PRESENTED A LEGITIMATE, NON-RETALIATORY REASON FOR ROSARIO'S TERMINATION WHICH SHE FAILS TO SHOW IS A PRETEXT FOR UNLAWFUL RETALIATION.

The Hartford's decision to terminate Rosario for violations of the sundown rule presents a legitimate, non-retaliatory reason for its actions. *See Allen v. Baptist Vill., Inc.,* 2008 U.S. App. LEXIS 7982, *1 (11th Cir. Apr. 11, 2008) (legitimate reason presented where employee was terminated for violating company policy).

Rosario fails to present any evidence to show that this legitimate, non-retaliatory reason is merely pretext for unlawful retaliation. Rosario acknowledges that she was terminated because of the sundown rule. (R 111:15-18). Rosario does not deny that she failed to return calls for which she was disciplined and terminated. (Rosario 191:12014). (Rosario 104:14-21, 106:14-23) (R 111:2-14). Rosario fails to refute The Hartford's reason for her termination as she concedes she violated the sundown rule. *See Morgan,* 2012 U.S.

App. LEXIS at *6-8 (employee failed to rebut the employer's non-retaliatory reason for terminating his employment where the employee conceded he violated the call-in procedures).   Rosario fails to establish that the reason for her termination is false and that retaliation was the real reason behind the written warning.

Rosario believes her termination was the result of her taking FMLA leave because several people on her team were on FMLA and she believes that an employer would expect its employees to be there every day and she was not.  (R 198:19-199:4, 217:22-218:9).  As explained above, "[u]nsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion." *Cordoba,* 419 F.3d at 1181.  The court in *Jirau v. Camden Dev., Inc.,* 2011 U.S. Dist. LEXIS 113186, *16 (M.D. Fla. September 30, 2011), struck down a similar argument as presented here by Rosario. The court explained that the mere possibility that the defendant may have decided that plaintiff's medical condition may result in future FMLA absences and then terminated her for that reason, is but speculation, which does not does create a genuine issue of fact.  *Id.*   Rosario fails to offer any evidence showing that The Hartford's reason for terminating her was pretextual. Accordingly, summary judgment should be granted in favor of The Hartford on Rosario's FMLA retaliation claim.

<u>CONCLUSION</u>

Summary judgment for The Hartford is warranted on all claims set forth by Plaintiffs. The Hartford respectfully requests that the Court enter an order granting summary judgment in favor of The Hartford and against Plaintiffs on all claims, and reserving jurisdiction to award The Hartford its fees and costs associated with defending against this meritless action.

WHEREFORE, Defendant, HARTFORD FIRE INSURANCE COMPANY respectfully requests that this Honorable Court enter an Order (i) GRANTING this motion; (ii) GRANTING summary judgment in favor of The Hartford and against Plaintiffs; (iii) RESERVING jurisdiction to award fees and costs per the indemnity provision of the Agreement and in accordance with applicable law; and (iv) GRANTING such additional relief as the Court deems appropriate.

DATED this 17th day of August, 2012.

Respectfully submitted,

JACKSON LEWIS LLP
390 North Orange Avenue, Suite 1285
Post Office Box 3389
Orlando, Florida 32802-3389
Telephone:     (407) 246-8440
Facsimile:     (407) 246-8441

By:     /s/ Donald C. Works, III
        Donald C. Works, III
        Florida Bar No.  340308
        worksd@jacksonlewis.com

        Jessica DeBono Anderson
        Florida Bar No. 0058503
        Jessica.anderson@jacksonlewis.com

Attorneys for Defendant HARTFORD FIRE INSURANCE COMPANY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of August, 2012, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:  Mary E. Lytle, Esquire, Lytle & Barszcz, 549 N. Wymore Road, Suite 207, Maitland, FL 32751.

/s/ Donald C. Works, III
    Donald C. Works, III